# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 46097

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | **Boise, February 2020 Term** |
| | ) | |
| **v.** | ) | **Opinion Filed: July 14, 2020** |
| | ) | |
| **MICHAEL AARON BONNER,** | ) | **Melanie Gagnepain, Clerk** |
| | ) | |
| **Defendant-Respondent.** | ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Peter G. Barton, District Judge.

The decision of the district court is <u>reversed</u>.

Lawrence G. Wasden, Idaho Attorney General, Boise, for Appellant. Kenneth K. Jorgensen argued.

Eric D. Fredericksen, State Appellate Public Defender, Boise, for Respondent. Sally J. Cooley argued.

———————————————

MOELLER, Justice.

This appeal arises from an Ada County district court's order granting Michael Bonner's motion to suppress evidence. Bonner was detained after a police officer observed him behaving suspiciously while Bonner was driving his vehicle and after he parked it. The State ultimately charged Bonner with felony driving under the influence of alcohol, including a persistent violator enhancement, and an enhanced misdemeanor driving without privileges. Bonner moved to suppress all evidence obtained as a result of his arrest, alleging that there was an insufficient basis for the underlying stop under the Fourth Amendment to the U.S. Constitution. Following the district court's order granting the motion to suppress, the State timely appealed. For the reasons explained below, we reverse.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On December 17, 2017, around 8:30 p.m., an officer with the Boise Police Department was driving a marked patrol car to a dispatch center in Meridian. The officer was exiting from

1

westbound I-84 onto northbound Eagle Road in Meridian and slowing for a red traffic light ahead when a red Volkswagen Jetta passed him in the second turn lane to his right, heading in the same direction. The Jetta did not slow for the light; however, the light turned green before the Jetta reached the intersection, and the car continued in the same direction at a higher rate of speed than the other cars. The officer testified that he thought that the Jetta might have been speeding, but eventually concluded otherwise.[1] As traffic proceeded northward, the officer noticed that the Jetta had a temporary registration in the back window. The officer decided to follow the Jetta.

As the officer followed the Jetta along the left side of Eagle Road, the driver switched lanes to the far right side of the road, exiting Eagle Road to the right at the first opportunity to do so. The Jetta pulled into the parking lot of St. Luke's Hospital, which was mostly empty. The Jetta was parked in the far end of the parking lot, in a spot about 100 yards from the entrance to an outpatient surgery center, and even further from the main hospital entrance. Based on the totality of these circumstances, the officer suspected that the driver of the Jetta was trying to avoid contact with him.

The officer pulled into the parking lot to observe the driver. The driver exited the Jetta and began to walk towards one of the hospital's outpatient buildings, which was dark and appeared closed. The driver attempted to open the front doors of the building, but they were locked. Instead of returning to his vehicle, the driver then walked around the side of the building, away from the officer and the Jetta. The officer then pulled his patrol car to the other side of the parking lot, exited his patrol car, and approached the driver. The driver was Michael Bonner.

The officer's body camera video shows Bonner standing on a strip of grass between the sidewalk and a curb, holding a cell phone. The officer approached Bonner and asked, "What are you doing?" Bonner replied but his exact words are unclear on the video, and the officer asked, "What—I'm sorry, what?" while adjusting the camera. Bonner then said, "I'm trying to figure out how I go see . . . ." It is unclear from the body camera video how Bonner finished that sentence because the officer interrupted Bonner, asking, "What are you doing *here*?" At this point, Bonner held up his phone, saying, "But I'm calling 'em right now to see, uh, which way I go."

---

[1] The officer testified that he thought the Jetta's speed "was too fast for the amount of roadway left to actually make a stop if it needed to, based on the proximity to the intersection." However, he conceded that he did not know how fast the Jetta was going: "That's why I didn't initiate a stop on speed."

The officer asked, "Do you have ID on you?" Bonner responded in the affirmative. The officer asked to see it. Bonner then pulled out his wallet and began opening it. While Bonner opened his wallet, the officer said, "You might want to slow down a little bit coming off the freeway there, guy. It's the whole reason I'm paying attention to you is because of that. You seem to be comin' a little fast." Bonner then gave the officer his license. The officer asked, "Is that your ride?" in reference to the Jetta. Bonner did not answer. At this point the officer ordered Bonner to sit on the curb. As he went to sit, Bonner fumbled for something in his pockets. The officer told him to take his hands out of his pockets. Bonner explained, "I was just getting my lighter." The officer repeated, "Sit down please," and told Bonner again to keep his hands out of his pockets.

The officer then called for backup and radioed in the details of Bonner's license. The officer asked Bonner if he was on probation or parole. Bonner admitted that he was on parole, and the officer asked what for, to which Bonner responded, "DUI." The officer asked if he had been drinking that night, and Bonner said no. Dispatch then informed the officer that Bonner's license was suspended. The officer asked Bonner, "What's going on with your license?" Bonner responded that it was indefinitely suspended.

The officer then told Bonner:

> You're driving on a suspended license, you know that, you're driving—coming off the freeway *very quickly*, but I made consensual contact with you to figure out why you're walking around—you parked your car all the way over there, and then you walked over here, you can't get in the building—and you have no reason to be over here. Explain to me why you're here.

Bonner told him that he was trying to visit his girlfriend's grandparents in the hospital but he was not sure if he was at the right building. The officer told him that he was at the wrong building—the outpatient surgery building—and that it should be obvious it was closed because there were no cars in the parking lot. The officer concluded by saying, "[s]o, your behavior's very suspicious to me." The officer also told him that he smelled alcohol. Bonner denied that he had been drinking. At this time, Bonner was placed under arrest for driving without privileges and on suspicion of DUI. Bonner later underwent a breath test, which revealed a blood alcohol content of 0.92. Bonner was charged with driving under the influence as well as driving without privileges.

Bonner filed a motion to suppress, arguing that the officer lacked reasonable articulable suspicion that a crime had occurred, or was about to occur, and had seized Bonner by taking his

3

identification and ordering him to sit on the curb. The State argued that Bonner had waived his Fourth Amendment rights in his parole agreement, and therefore lacked standing to object to the seizure. The State argued alternatively that the police officer had made consensual contact with Bonner, and if the instruction for Bonner to sit on the curb constituted a detention, it was a seizure supported by reasonable articulable suspicion of criminal activity.

The officer testified during the suppression hearing. He stated that based on his training and experience, he thought Bonner was avoiding him by quickly leaving the roadway and pulling into the St. Luke's parking lot, and then by leaving his car and walking to the closed outpatient surgery building.[2] He also stated that, in particular, his initial suspicions were related to Bonner apparently distancing himself from his vehicle because he was unable to read the temporary tags in the Jetta's back window. On cross-examination, the officer conceded that there was no alert for him to be on the lookout for a stolen vehicle with the Jetta's description, and that he had not pursued running the temporary registration on the Jetta after Bonner had exited the vehicle.[3]

On redirect, the officer stated the following:

Well, the totality of the – the totality of that reason is based on the high speed of the vehicle and that I maneuver [sic] behind it. I follow it. It now gets on the road. And it does reduce the speed, but now it's on Eagle Road and it makes lane changes, in my view, to stay away from me, and then proceeds to now merge into a parking lot and stop in the parking lot away from any building that is close proximity, reasonable proximity. And then after that, tries to go in the building and doesn't get in.

And now is looking – he's never looking at me in the sense like he acted nervous by that, by not even looking at me. And then he walks off as if, "Oh, I'm just going to forget the car. I'm going to forget what I was trying to do at the building."

It was very peculiar, very suspicious, and it made me think that there was something more with this vehicle than what I currently could know or was safely able to know at that particular point in time.

The district court granted Bonner's motion to suppress. The district court first concluded that, while the officer's initial approach and request for Bonner's license was not a seizure, the

---

[2] It is unclear from the record how a Boise Police Department officer would have the authority to patrol and conduct a routine traffic stop in Meridian, which is outside the territorial limits of the city which employed him. Once a police officer leaves the jurisdiction of the city or political subdivision that employs him, the officer is only statutorily authorized to exercise police authority in a narrow set of circumstances, as set forth in Idaho Code sections 19-701A, 50-209, and 67-2337(2). Nevertheless, this was not raised as an issue below.

[3] When asked why he had not attempted to run the temporary tags after Bonner exited the vehicle and walked away, the officer answered, "I could have. However, I did not. And the reason is because [Bonner] was of great interest to me. And if I looked the other way and spent any amount of time focused on this little piece of paper in the window, I would have lost [Bonner]."

4

encounter became a seizure when the officer ordered Bonner to sit on the curb. The district court also held that Bonner's waiver of his Fourth Amendment rights in his parole agreement was not an effective waiver where the police officer did not know of Bonner's status as parolee at the time of the seizure. The State timely appealed.

## II.    STANDARD OF REVIEW

"The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, the Court accepts the trial court's findings of fact that are supported by substantial evidence, but freely reviews the application of constitutional principles to the facts as found." *State v. Bodenbach*, 165 Idaho 577, 589, 448 P.3d 1005, 1017 (2019) (quoting *State v. Moore*, 164 Idaho 379, 381, 430 P.3d 1278, 1280 (2018)). "This Court will accept the trial court's findings of fact unless they are clearly erroneous." *State v. Gonzales*, 165 Idaho 667, 671, 450 P.3d 315, 319 (2019) (quoting *State v. Purdum*, 147 Idaho 206, 207, 207 P.3d 182, 183 (2009)).

"Determinations of reasonable suspicion are reviewed de novo." *Id.* (quoting *State v. Morgan*, 154 Idaho 109, 111, 294 P.3d 1121, 1123 (2013)). "The review must be based on the totality of the circumstances rather than examining each of the officer's observations in isolation." *Id.* (citation omitted); *see also United States v. Arvizu*, 534 U.S. 266, 274 (2002).

## III.    ANALYSIS

On appeal and before the trial court, the State opposed Bonner's motion to suppress by arguing: (1) Bonner, as a parolee, could not assert a Fourth Amendment challenge because he had previously consented to warrantless searches as a term of his parole, and thus, had no subjective expectation of privacy; (2) the stop was otherwise consensual; and (3) the officer's testimony demonstrated that he had reasonable suspicion for the initial detention, which developed into probable cause. Because it is dispositive of the appeal, we will only address the State's third argument.

### A. The district court erred in ruling that the police officer did not have reasonable suspicion to detain Bonner.

The district court concluded that the officer lacked reasonable suspicion that Bonner had committed a traffic offense or that he was in possession of a stolen vehicle when he was seized.[4]

---

[4] The district court found that "[b]oth parties agree that the officer seized Mr. Bonner when the officer asked him, as seen at about 1:24 of the officer's bodycam video, to sit on the curb." The State has not argued that this did not constitute a seizure on appeal.

The district court pointed out that "[a]t the time he demanded that Mr. Bonner sit on the curb, [the officer] knew that Mr. Bonner was standing still, responding to his questions and was not running away from him." In so holding, the district court "decline[d] to adopt a test whereby odd or unusual behavior justifies a search or seizure," and concluded that "courts should avoid an analysis whereby 'a vague suspicion could be transformed into probable cause for arrest by reason of ambiguous conduct.' " (quoting *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).

On appeal, the State argues that the officer did have "reasonable suspicion justifying a temporary investigative detention of Bonner to ascertain whether Bonner was trying to avoid detection of a crime involving Bonner or his car." The State asserts that Bonner's behavior appeared intentionally evasive to the officer and, citing *Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000), argues that this was a pertinent factor in the officer's reasonable suspicion. The State goes on to argue that *Wong Sun* was "wrongly applied in the investigative detention context[,]" and is more appropriate "for evaluating probable cause to arrest[.]" According to the State, the district court erred as a matter of law in employing an incorrect legal standard—*Wong Sun*—in finding that ambiguous conduct could not lead to reasonable suspicion.

Bonner counters, arguing that the State has not challenged the district court's finding that Bonner was not attempting to avoid or evade the officer at the time the officer detained him. Bonner asserts that "[a]t most, [the officer] had an unsubstantiated hunch that Mr. Bonner may have been driving an unregistered or stolen car." Bonner argues that "[a]n officer does not have reasonable articulable suspicion of criminal wrongdoing when an officer develops a suspicion that a driver may not want to have contact with that officer[,]" contending that *Wardlow*, 528 U.S. at 119, does not support the State's argument because Bonner was not evading or avoiding the officer, much less engaging in headlong flight as in *Wardlow*. The State responds by noting that the district court "held that ambiguous circumstances cannot justify an investigative detention." The State reiterates that these were not merely *ambiguous* circumstances, but, taken as a whole, were *suspicious* circumstances—Bonner appeared to be actively attempting to avoid the officer by "trying to evade any contact with the officer that involved his car."

Under the Fourth Amendment of the U.S. Constitution, an investigatory seizure is permitted if an officer has "reasonable articulable suspicion that a person has committed, or is about to commit, a crime." *State v. Bishop*, 146 Idaho 804, 811, 203 P.3d 1203, 1210 (2009) (citing *Florida v. Royer*, 460 U.S. 491, 498 (1983)). "Reasonable suspicion must be based on

6

specific, articulable facts and the rational inferences that can be drawn from those facts." *Id.* (citations omitted).

> [R]easonable suspicion requires more than a mere hunch or "inchoate and unparticularized suspicion." [*Alabama v. White*, 496 U.S. 325, 329 (1990) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989))]. Whether an officer possessed reasonable suspicion is evaluated based on the totality of the circumstances known to the officer at or before the time of the stop. [*State v. Sheldon*, 139 Idaho 980, 983, 88 P.3d 1220, 1223 (Ct. App. 2003)]; *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

*Id.* (parallel citations omitted). In determining whether an officer has reasonable suspicion, "due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry v. Ohio*, 392 U.S. 1, 27 (1968).

The State contends that the district court's reference to *Wong Sun* signaled the district court's application of an erroneous legal standard to these facts. In *Wong Sun*, the U.S. Supreme Court was confronted with the seizure of a defendant, largely justified on information provided by informants, whose reliability was questionable. The U.S. Supreme Court concluded that "[t]o hold that an officer may act in his own, unchecked discretion upon information too vague and from too untested a source to permit a judicial officer to accept it as probable cause for an arrest warrant, would subvert this fundamental policy." *Wong Sun*, 371 U.S. at 482. Thus, *Wong Sun* is not wholly applicable to the case at hand because it concerns *vague* information provided by unproven informants and relied upon by an officer to make an arrest, rather than arguably ambiguous, yet suspicious behavior witnessed by an officer and relied upon to make an investigatory detention.

The reasonable suspicion standard applicable to justify an investigative stop is considerably different than the probable cause required for an arrest. As previously noted, while "an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 273 (quoting *Terry*, 392 U.S. at 27). The U.S. Supreme Court explained its rationale for drawing a distinction between probable cause and reasonable suspicion:

> Because the "balance between the public interest and the individual's right to personal security" tilts in favor of a standard less than probable cause in brief investigatory stops of persons or vehicles, the Fourth Amendment is satisfied if

> the officer's action is supported by reasonable suspicion to believe that criminal activity "may be afoot."
>
> . . . . This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person."

*Id*. at 273 (internal citations omitted). By allowing brief detentions based on reasonable suspicion, rather than probable cause, "*Terry* accepts the risk that officers may stop innocent people." *Wardlow*, 528 U.S. at 126. In sum, courts must "look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273.

Of course, "[a] determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." *Id*. at 277. Yet, if the mere possibility of an innocent explanation were all that is necessary to undermine an otherwise valid investigatory detention based on reasonable suspicion of criminal behavior, it would severely limit the ability of law enforcement officers to prevent crime and ensure public safety. For example, under such an approach the defendant in *Terry*—the seminal case for investigative stops of this nature—could have suppressed the results of the officer's stop on the grounds that his "elaborately casual and oft-repeated reconnaissance of the store window" might have merely been window shopping, rather than "casing" the premises in preparation for a burglary. *Terry*, 392 U.S. at 6; *see also Wardlow*, 528 U.S. at 125 ("Even in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation.") It would be naïve to assume that most criminal defendants, even unsophisticated ones, do not attempt to avoid detection and mask their true intentions by acting in an ambiguous manner so that they may appear beyond suspicion. Again, this does not give an officer carte blanche authority to stop individuals for ambiguous behavior; the officer still "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21.

Here, the officer's initial observations of Bonner's behavior led the officer to a reasonable inference that Bonner was attempting to evade him. It is well-established that "evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124. The officer then testified that as he followed Bonner, his suspicion became centered on the vehicle. The officer's testimony was consistent and measured as he reiterated his belief that Bonner was trying to distance himself from his vehicle, and, therefore, there must be some kind

8

of violation related to his vehicle. The evidence the officer testified to that formed the basis for his suspicions included the following observations:

- After the officer began to follow him, Bonner began "looking around" as he drove;

- Bonner's car had a temporary registration, which the officer could not see well enough to determine whether it was valid;

- Bonner then "moved lanes from where we were at all the way to the right lane" and turned into the St. Luke's hospital complex;

- Bonner pulled into the parking lot and parked "a distance away" from an outpatient surgery building, and "even further away from the hospital itself," even though there were spots "close to the building" because "there were no other vehicles in the parking lot";

- The outpatient surgery center appeared closed because of the lack of cars in the parking lot and the low light levels in the building;[5]

- Bonner approached the outpatient surgery building and tried, but failed, to get in; and

- Bonner then walked away in the opposite direction of both the building and his car, as if he was abandoning both the vehicle and his purpose for being there.

Finally, the officer explained why he found this behavior to be suspicious:

> [F]rom my training and experience, it seemed suspicious in nature based upon the fact that the business was closed. And what I had observed, I felt like something more was going on. So I went and contacted the driver. . . . Well, again, with this evasive kind of mannerism behavior, that was suspicious to me, in the vehicle specifically. And I couldn't solidify what the vehicle was as far as is it a legitimate vehicle? Is it registered appropriately? Is it stolen? I started to have suspicion that maybe this vehicle was stolen. . . . All those concerns together is why I made contact with that driver.

It was at this point that the officer began a brief dialog with Bonner. When the officer eventually asked, "Is that your ride?" in reference to the Jetta the officer had seen Bonner driving moments earlier, Bonner did not answer. The officer then asked Bonner to sit on the curb. The parties agree that this is the moment when the seizure began. The officer then called into dispatch and learned that Bonner's license had been suspended.

The facts articulated by the officer and found to be true by the district court, provided a reasonable basis for suspicion that illegal activity "may be afoot." *Sokolow*, 490 U.S. at 7. The specific inference the officer drew from these facts—that Bonner was distancing himself from the Jetta because the vehicle was stolen or was without proper registration—is supported by the

---

[5] The officer testified that this occurred at "[a]bout 8, 8:30" in the evening, which would be a few hours after sunset on December 17.

totality of the circumstances and the information available to the officer at the time he ordered Bonner to sit down. Although a court need not rule out the possibility of innocent explanation, *Arvizu*, 534 U.S. at 277, the facts the officer pointed to in justifying Bonner's detention were sufficient to support a reasonable inference with respect to the vehicle-related crimes the officer suspected had occurred. Ultimately, the officer's testimony that Bonner's behavior, both before and after he parked his vehicle, made him feel "like something more was going on," cannot be brushed away as a mere hunch that a crime related to the vehicle was in progress. The officer provided a factual basis for his suspicion, as evinced by the totality of the circumstances. This is precisely the type of determination that alert law enforcement officers are permitted to make under the Fourth Amendment.

Accepting the findings of the district court as true, we nonetheless conclude that the totality of the circumstances supports the conclusion that the officer articulated a reasonable basis for suspecting that illegal conduct was taking place. Therefore, while we acknowledge that this is a very close question, we conclude that the district court erred in granting the motion to suppress. In light of this ruling, it is unnecessary to address the State's alternative theory that the stop was consensual.

## B. We need not address whether Bonner retained a reasonable expectation of privacy concerning searches of his person in light of his parole waiver.

As in *State v. Saldivar*, 165 Idaho 388, 393, 446 P.3d 446, 451 (2019), we acknowledge that this Court typically addresses the question of whether there was a reasonable expectation of privacy as the first step in its Fourth Amendment analysis; however, there is no need to do so here. Having concluded that there was reasonable suspicion for the investigatory detention, the officer was permitted to request Bonner's driver's license and run a check through dispatch, regardless of Bonner's status as a parolee. Likewise, upon learning from dispatch that Bonner's license was suspended, there was probable cause to arrest him, independent of his status as a parolee. Therefore, given that there was a valid constitutional basis for denying the motion to suppress, we decline the State's invitation to further delineate the extent of Bonner's Fourth Amendment expectation of privacy as a parolee.

## IV. CONCLUSION

For the foregoing reasons, we reverse the district court's ruling granting Bonner's motion to suppress. Accordingly, this matter is remanded to the district court for further proceedings consistent with this opinion.

Chief Justice BURDICK, and Justices BRODY, and BEVAN **CONCUR.**

STEGNER, J., dissenting.

I respectfully dissent from the majority's opinion. I cannot agree with the conclusion that the police officer had reasonable suspicion to detain Bonner. I would therefore affirm the district court's suppression of the evidence obtained through the unlawful detention.

The touchstone of "reasonable suspicion" requires more than a list of an officer's observations. There is a constitutional requirement that the officer identify "specific and articulable facts" that must then be "taken together with rational inferences from those facts" in order to justify a seizure. *See Terry v. Ohio*, 392 U.S. 1, 20 (1968). The question to be asked is whether the government intrusion is reasonably warranted? "[D]ue weight must be given, not to [an officer's] inchoate and unparticularized suspicion or 'hunch,' but to the *specific reasonable inferences* which he is entitled to draw from the facts in light of his experience." *Id.* at 27 (italics added). I cannot concur with the majority because I believe the majority places too much stock in the articulated facts to justify the officer's actions. It is not enough that inferences drawn from those facts might be *plausible*—they must also be *specific* and *reasonable*. *Id.* at 27. Here, they are not.

First, the inferences the State asks this Court to accept are not *specific*. The officer stated that Bonner displayed "evasive kind of mannerism behavior, that was suspicious to me, in the vehicle specifically." It should be noted that the officer pointedly denied witnessing any traffic violation which he could attribute to Bonner, despite the law permitting a traffic stop upon reasonable suspicion for a traffic violation. *See State v. Linze*, 161 Idaho 605, 609, 389 P.3d 150, 154 (2016) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)) ("The United States Supreme Court has plainly established that a traffic stop is a seizure, but it is not an unreasonable seizure under the Fourth Amendment so long as there is a reasonable suspicion that the vehicle is being driven contrary to traffic laws.") Later, the officer said he suspected that Bonner was driving a stolen vehicle or did not have proper registration because he could not read the Jetta's temporary tags. (Tellingly, our recent case law clarifies that simply because someone is operating a vehicle with a temporary license does not provide reasonable suspicion to stop that individual to determine the validity of the vehicle's registration. *See State v. Cook*, 165 Idaho

11

305, 312, 444 P.3d 877, 884 (2019). Consequently, Bonner's temporary permit could not have provided reasonable suspicion to the officer.)

Neither are these proposed inferences *reasonable* given the supporting facts. The *only* justification for the officer's suspicion to focus on the *vehicle* was that (1) the officer could not make out the registration in the Jetta's window while he was driving, (2) Bonner had left his vehicle and walked to the outpatient surgery building, and (3) Bonner did not give an immediate answer to the officer's question, "Is that your ride?" Bonner caught the police officer's attention because it appeared as though Bonner was avoiding *him*.[1] Much later, the police officer justified detaining Bonner because it appeared as though Bonner was avoiding *his own vehicle*.

Finally, the majority's glossing over the "specific reasonable inferences" part of the reasonable suspicion analysis weakens the Fourth Amendment's protections. In the words of former Chief Justice Warren, "[The] demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." *Terry*, 392 U.S. at 21 n.18. Taking the State's argument to its logical end yields the conclusion that the more ambiguous a set of circumstances, the less protection the Fourth Amendment affords citizens. This argument incorrectly states the law, and if accepted, would pervert the Constitution and limit its protections. When ambiguous facts are allowed to provide a basis for the establishment of reasonable suspicion, the less important "articulable facts" become. *See United States v. Young*, 707 F.3d 598, 603 (6th Cir. 2012) (quoting *United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011)) ("Ambiguous behavior does not give rise to reasonable suspicion because 'reasonable suspicion looks for the exact opposite of ambiguity.'").

At the motion hearing, the police officer returned repeatedly to the amorphous statement that there was "something more going on" that he used to justify Bonner's detention. What the officer had was an inchoate hunch. What he needed in order to comply with the Constitution was reasonable suspicion. The district judge who heard the officer testify and was therefore able to gauge the officer's credibility was unpersuaded. Bonner's motion to suppress the evidence was granted because the officer failed to establish "specific and articulable facts" to justify the officer's detention of Bonner. Although we review conclusions of reasonable suspicion *de novo*, we defer to the district court's findings of fact and determinations about witness credibility. *See*

---

[1] As noted by the majority at footnote 2, the officer who seized Bonner was outside his jurisdiction (Boise City) when he encountered Bonner. Given that the officer had no authority in the neighboring city of Meridian, it is hard to understand how a citizen would find it necessary to evade an officer who had no jurisdiction to enforce the law.

*State v. Bishop*, 146 Idaho 804, 810, 203 P.3d 1203, 1209 (2009). I concur with the district judge who heard the evidence, was better able to ascertain what occurred, and concluded that the officer relied on an unsubstantiated "vague suspicion" of criminal activity to justify Bonner's seizure. *See State v. Page*, 140 Idaho 841, 844, 103 P.3d 454, 457 (2004); *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

The fact that something came of Bonner's unlawful seizure should not beguile us into thinking this was somehow "good police work." The Constitution demands more than an after-the-fact assessment of what was uncovered by an overzealous officer. For these reasons, I respectfully dissent.