**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 47690**

| | |
|---|---|
| STATE OF IDAHO, | ) |
| | ) **Filed: August 11, 2021** |
| Plaintiff-Respondent, | ) |
| | ) **Melanie Gagnepain, Clerk** |
| v. | ) |
| | ) **THIS IS AN UNPUBLISHED** |
| PATRICK TYLER MAAHS, | ) **OPINION AND SHALL NOT** |
| | ) **BE CITED AS AUTHORITY** |
| Defendant-Appellant. | ) |
| | ) |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Deborah A. Bail, District Judge.

Judgment of conviction for trafficking in methamphetamine, <u>affirmed</u>.

Thomas Monaghan, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Justin R. Porter, Deputy Attorney General, Boise, for respondent. Justin R. Porter argued.

---

LORELLO, Judge

Patrick Tyler Maahs appeals from his judgment of conviction for trafficking in methamphetamine. We affirm.

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

A credit union employee reported to police that a man left after making a large cash deposit[1] and, while in the parking lot, changed his clothes and conferred with two other men who then entered the credit union while the man who changed his clothes remained in the parking lot. When an officer arrived, he observed the two other men, Maahs and a companion, at the teller

---

[1] Later, the officers learned that this was in error and this man did not make a deposit.

window.[2]  After noticing the officer, the two men briefly talked with each other and went into a single-person bathroom, one shortly after the other.  The officer heard the sound of a toilet flush.  While talking with credit union employees, the officer learned that the two men had made an $8000 cash deposit.[3]  A second officer arrived at the scene.  When Maahs exited the bathroom, both officers ordered him to come to them.  Instead of complying, Maahs backed up and looked over his shoulder toward a door at the end of the hallway.  The second officer drew his gun and pointed it at Maahs, who then sat down on the floor.  The second officer holstered his gun, handcuffed Maahs and searched him, locating "some type of sheriff's badge" in one of Maahs' pockets.  While the second officer was interacting with Maahs, the first officer was trying to get Maahs' companion to exit the locked bathroom.  Maahs' companion was also detained after he opened the bathroom door.  Because the officers wanted to separate the two, Maahs was placed in a police vehicle while his companion was detained in the credit union's lobby.

A third officer searched the bathroom and located plastic sandwich bags, which were "wet, both inside and out, and appeared to have been torn open," and also "some plastic consistent with vacuum seal plastic."  A knife retrieved from Maahs' companion had "white residue on the end" and "a piece of plastic" on it matching the vacuum seal plastic found in the bathroom.  A field test indicated that the white residue on the knife was amphetamine.

At some point either during or after the above events, a drug dog alerted to the presence of drugs in the vehicle in which Maahs had arrived, and his parole officer appeared at the scene.  A search of the vehicle yielded over a pound of methamphetamine, a loaded shotgun, cocaine, digital scales, two safes, a vacuum sealer, and packaging material.  Maahs' parole officer asked Maahs to unlock his cell phone to allow the parole officer to search it.  Maahs agreed to enter his password but, instead, grabbed the cell phone and smashed it on the ground.  The State charged Maahs with trafficking in methamphetamine, unlawful possession of a firearm, two counts of destruction of evidence (flushing drugs and smashing his cell phone), possession of a controlled

---

[2]     The man who was with Maahs and his companion in the parking lot was detained there by a different officer.

[3]     The actual amount of the deposit was $8140.

2

substance (cocaine), and possession of drug paraphernalia. The State also filed a persistent violator allegation.

Maahs moved to suppress evidence obtained from the search of the vehicle, contending in part that the officers did not have reasonable suspicion to detain him and that, in the alternative, the detention amounted to a de facto arrest for which the officers lacked probable cause. After the district court denied his motion, Maahs entered a conditional guilty plea to trafficking in methamphetamine, I.C. § 37-2732B(a)(4)(C), reserving the right to appeal the denial of his motion to suppress. In exchange for Maahs' guilty plea, the State dismissed the remaining five counts and the persistent violator sentencing enhancement. Maahs appeals.

## II.

## STANDARD OF REVIEW

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).[4]

---

[4] In his opening brief, Maahs asserts that we should freely review the district court's findings regarding events captured by the officers' bodycams, citing *State v. Andersen*, 164 Idaho 309, 312, 429 P.3d 850, 853 (2018). In *Andersen*, the Idaho Supreme Court concluded it could freely review and weigh the evidence in the same manner as the trial court because it had "exactly the same evidence before it as was considered by the [trial] court," i.e., the transcript of the preliminary hearing and the officer's video recording. *Id.* at 312, 429 P.3d at 853. According to Maahs, because this Court has "the same bodycam recordings . . . that the district court had," we need "not defer to the district court's evaluation of that evidence." We disagree and reject Maahs' assertion that *Andersen* permits such a piecemeal approach. If a party presents live testimony to the trial court, then the appellate court no longer has "exactly the same evidence before it" and must apply the usual deference to the trial court's findings. *Id.* Here, the district court heard live testimony and, thus, we apply the deferential standard of review generally applicable to suppression decisions as set forth above.

# III.

# ANALYSIS

Maahs challenges the district court's factual findings and asserts that the district court erred in concluding that the officers had reasonable suspicion to detain him and that his detention did not rise to the level of a "de facto arrest." The State responds that Maahs has failed to show that the district court's factual findings are clearly erroneous or that the district court's legal conclusions were erroneous. We hold that Maahs has failed to meet his burden of showing that the district court's decision was factually or legally erroneous.

## A.     Challenge to Factual Findings

Maahs asserts the district court erred in finding that he attempted to flee from the officers. Maahs also asserts the district court erred by characterizing the search of his person as a "frisk." The State responds that substantial evidence supports the district court's factual findings.[5]

The district court found that Maahs "appeared to be ready to flee" when the officers confronted him after he exited the bathroom. Maahs asserts that, based on the bodycam video, "the reasonable conclusion was not that he sought to escape" but, rather, he "was just instinctively backing away from the confrontational [second officer], who drew and pointed his firearm at [Maahs]." That Maahs has a different, more favorable, interpretation of the evidence does not demonstrate that the district court's contrary factual finding was clearly erroneous.

The first officer's bodycam video shows that, after Maahs exited the bathroom, the officers ordered him to come to them. Instead of doing so, Maahs backed away and glanced over his shoulder toward a door at the end of the hallway. At the suppression hearing, the first officer testified that "Maahs turned his body towards that door in the hallway and appeared to be looking at that door, possibly as an escape route." The second officer testified that Maahs

---

[5]     The State also argues that Maahs waived consideration of whether the district court's factual findings were erroneous because, in his opening brief, Maahs advocated for free review under *Andersen* and did not present an argument under the deferential clearly erroneous standard generally applicable to factual findings. As noted, we reject Maahs' argument for free review under *Andersen*. Nevertheless, we conclude that Maahs' challenges to the district court's factual findings are preserved under *State v. Jeske*, 164 Idaho 862, 870, 436 P.3d 683, 691 (2019) (disavowing any requirement for a "formalistic recitation" of the relevant standard of review when a party's arguments allow the appellate court to discern the applicable standard).

"turned away to go away." The bodycam video and the officers' testimony provides substantial evidence for the district court's finding that Maahs appeared ready to flee.

Maahs advances other explanations for his actions--specifically, that his reaction was instinctual, that he was confused, and that his "partial turn and glance . . . [were] likely designed to avoid anyone who might be behind him or the water fountain beside him." In support, Maahs notes that the officers testified that he appeared shocked and surprised when the officers commanded him to come to them, that he kept his cell phone to his ear, that he did not reach for the door handle or complete his pivot toward the door, and that he uttered exclamations consistent with someone who was confused. While Maahs' explanations may be plausible, he essentially asks this Court to reweigh the evidence. We decline to do so. *See Atkinson*, 128 Idaho at 561, 916 P.2d at 1286.

Next, Maahs asserts the district court erred in "characteriz[ing] . . . Maahs as having been 'frisked' after he was handcuffed," a characterization that Maahs couches as a "factual finding." Maahs asserts this was error because the second officer "completely remov[ed] the objects in [Maahs'] pockets" and, according to Maahs, the second officer later admitted at the suppression hearing that "he had emptied the contents of [Maahs'] pockets, rather than just conducting a pat-down frisk." Maahs also asserts that the search exceeded the legal bounds of a proper frisk. Notably, Maahs has not sought, either before the district court or on appeal, to suppress evidence of the items found from the search he contends the district court improperly characterized as a frisk. Instead, he asserts the alleged impropriety of the search supports his contention that his detention amounted to a "de facto" arrest. As discussed below, however, Maahs' detention was reasonable under the circumstances. Consequently, we need not determine whether the characterization of the search is a factual question (as opposed to solely a legal question) or address the factual and legal arguments Maahs raises regarding the search.

## B. Investigatory Detention

Maahs asserts he was seized without reasonable suspicion and that, even if reasonable suspicion existed, the officers' actions in effectuating the seizure were unreasonable because those actions converted the seizure into a "de facto" arrest without probable cause. The State argues otherwise, contending that the district court correctly concluded that the officers had

5

reasonable suspicion at the time of Maahs' seizure and that, under the totality of the circumstances, the officers' actions did not violate the Fourth Amendment.

The determination of whether an investigative detention is reasonable requires a dual inquiry--whether the officer's action was justified at its inception and whether it was reasonably related in scope to the circumstances, which justified the interference in the first place. *State v. Roe*, 140 Idaho 176, 181, 90 P.3d 926, 931 (Ct. App. 2004); *State v. Parkinson*, 135 Idaho 357, 361, 17 P.3d 301, 305 (Ct. App. 2000). An investigative detention is permissible if it is based upon specific, articulable facts which justify suspicion that the detained person is, has been, or is about to be engaged in criminal activity. *State v. Sheldon*, 139 Idaho 980, 983, 88 P.3d 1220, 1223 (Ct. App. 2003). Such a detention must be temporary and last no longer than necessary to effectuate the purpose of the stop. *Roe*, 140 Idaho at 181, 90 P.3d at 931; *State v. Gutierrez*, 137 Idaho 647, 651, 51 P.3d 461, 465 (Ct. App. 2002). When a person is detained, the scope of the detention must be carefully tailored to its underlying justification. *Roe*, 140 Idaho at 181, 90 P.3d at 931; *Parkinson*, 135 Idaho at 361, 17 P.3d at 305. In this regard, we must focus on the intensity of the detention, as well as its duration. *Roe*, 140 Idaho at 181, 90 P.3d at 931. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. *Roe*, 140 Idaho at 181, 90 P.3d at 931; *Parkinson*, 135 Idaho at 361, 17 P.3d at 305. Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Whether the Fourth Amendment is violated during the course of an investigatory detention is not automatically answered by the assessment of whether police tactics did or did not amount to a "de facto" arrest. *State v. Stewart*, 145 Idaho 641, 645, 181 P.3d 1249, 1253 (Ct. App. 2008). Rather, the relevant question is whether, under the totality of the circumstances, the detention was reasonable. *See id.*

Maahs was seized when he submitted to the officers' show of authority by sitting on the floor. *See Padilla v. State*, 161 Idaho 624, 626, 389 P.3d 169, 171 (2016) (explaining a "seizure does not occur until a person is either physically restrained by police or yields to a show of authority and stops"). The district court made several factual findings relevant to its conclusion that the officers had reasonable suspicion to detain Maahs at that time. First, the district court found that the officers were present at the location of the seizure because they received a report

6

from a credit union employee that three men, one of whom had changed his clothing, were "talking with each other in the [credit union's] parking lot" and that "a very large cash deposit (or deposits) had been made." Regarding the information received from the credit union employee, the district court noted the first officer was aware "that tellers are specifically trained to observe unusual or suspicious situations which might indicate a possible robbery." Second, the district court found that the first officer became concerned after encountering locked interior doors at the credit union's entrance. At the suppression hearing, the officer testified that in his experience, "banks . . . lock[] their doors when something is going on, to either detain someone inside or prevent others from getting inside."[6] Third, the district court found that, after becoming aware of the first officer's presence, Maahs and his companion went into the bathroom despite being told by a credit union employee that the bathroom was for only one person. Fourth, the district court found that, while Maahs and his companion were in the single-person bathroom together, the first officer heard a toilet flush. Fifth, the district court found that, after exiting the bathroom, Maahs backed away from the officers and appeared ready to flee. Collectively, these facts support a finding that criminal activity may be afoot. The known identity of the reporting credit union employee, in addition to the training given to credit union employees, renders the initial information reported to the officers reliable. *State v. Van Dorne*, 139 Idaho 961, 965, 88 P.3d 780, 784 (Ct. App. 2004) (observing that disclosure of a reporting party's identity "is generally deemed adequate to show veracity and reliability"); *cf. United States v. Watson*, 587 F.2d 365, 367 (7th Cir. 1978) (holding that out-of-court identification was reliable because, among other things, the identifying party was "an experienced teller with special identification training"); *State v. Meyer*, 158 Idaho 953, 956, 354 P.3d 515, 518 (Ct. App. 2015) ("Reasonable suspicion is derived from what an officer observes and interprets based upon the officer's training and experience."). The large cash deposit, coupled with the unusual situation of two grown men being in a single-person bathroom together and flushing a toilet after becoming aware of an officer's presence, suggest some crime connected with drugs, such as destruction of evidence or trafficking. *See United States v. Daniels*, 930 F.3d 393, 401 (5th Cir. 2019) (holding that sound of toilet flushing, among other factors, suggested "that the room's occupants might

---

[6]     Later, the officer learned that the doors were locked because it was closing time.

have been attempting to destroy evidence"); *United States v. Thomas*, 913 F.2d 1111, 1115 (4th Cir. 1990) (noting that "possession of unusually large amounts of cash . . . may be circumstantial evidence of drug trafficking"). In addition, the odd behavior of the three men (one leaving the credit union after conducting business, changing clothes, and then conferring with two other men who then entered the credit union) supports reasonable suspicion that criminal activity may be afoot, including a potential robbery. Maahs' evasive actions, both before and after being in the bathroom, further support suspicion of criminal activity. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (noting that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"); *State v. Bonner*, 167 Idaho 88, 95-96, 467 P.3d 452, 459-60 (2020) (concluding that suspect's evasive actions and distancing himself from a vehicle he had been driving gave officer a "reasonable basis for suspecting that illegal conduct was taking place"). Based on these facts, we hold that the officers had reasonable suspicion of criminal activity that justified Maahs' detention in order to investigate further.

Maahs argues that reasonable suspicion did not exist because the officers indicated they were unsure as to what specific crime was occurring. For instance, the first officer admitted that, while waiting outside the bathroom, he told the second officer, "I don't know what we have exactly, but I figured we'd detain them," referring to Maahs and his companion. Maahs asserts that this and similar testimony "underscore[s] how [the officers] lacked objective justification for their actions." However, as the State argues, an officer need not have "a belief that any *specific* criminal activity is afoot to justify an investigative detention; instead, all that is required is a showing of objective and specific articulable facts giving reason to believe that the individual has been or is about to be involved in *some* criminal activity." *State v. Perez-Jungo*, 156 Idaho 609, 615, 329 P.3d 391, 397 (Ct. App. 2014). The officers' uncertainty about precisely what crime was afoot is of no import. *See Bonner*, 167 Idaho at 96, 467 P.3d at 460 (concluding there was reasonable suspicion because the officer provided facts supporting a reasonable inference of "vehicle-related crimes the officer suspected had occurred").

Maahs also asserts the district court failed to weigh facts he contends diminishes reasonable suspicion. Specifically, Maahs notes that the officers testified that their experience with robberies at credit unions did not include a person making a deposit prior to a robbery and that Maahs appeared shocked and surprised, not cautious and wary, upon exiting the bathroom.

8

A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct. *Arvizu*, 534 U.S. at 277. In addition, "[i]t would be naive to assume that most criminal defendants, even unsophisticated ones, do not attempt to avoid detection and mask their true intentions by acting in an ambiguous manner so that they may appear beyond suspicion." *Bonner*, 167 Idaho at 95, 467 P.3d at 459. Maahs has failed to show that the district court erred in concluding that the officers had reasonable suspicion to detain him.

Turning to the second part of our dual inquiry, we address whether the officers' actions were reasonably related in scope to the circumstances which justified the interference in the first place. *See Roe*, 140 Idaho at 181, 90 P.3d at 931; *Parkinson*, 135 Idaho at 361, 17 P.3d at 305. An officer may detain a suspect using handcuffs without exceeding the bounds of an investigative detention if "the handcuffs are a reasonable precaution for the officer's safety in the face of a substantial risk of danger or flight by the suspect." *State v. Sutterfield*, 168 Idaho 558, 568, 484 P.3d 839, 849 (2021). Similarly, a suspect's noncompliance or potential threat to officer safety can justify placing the suspect in a police vehicle. *State v. DuValt*, 131 Idaho 550, 554, 961 P.2d 641, 645 (1998) (concluding use of handcuffs to ensure officer safety was a reasonable precaution during an investigatory detention where occupants of vehicle were "far from cooperative" and the officers were "unaware exactly what activities" the occupants had been involved in); *State v. Pannell*, 127 Idaho 420, 424-25, 901 P.2d 1321, 1325-26 (1995) (discussing compliance and number of suspects as relevant factor in determining whether handcuffs may be used during investigatory detention); *State v. Johns*, 112 Idaho 873, 877, 736 P.2d 1327, 1331 (1987) (concluding that, under the totality of circumstances, "it was entirely reasonable for [the officer] to handcuff Johns for his own safety without negating the legality" of the investigative detention); *State v. Frank*, 133 Idaho 364, 368, 986 P.2d 1030, 1034 (Ct. App. 1999) (concluding that, in light of all the surrounding circumstances, handcuffing suspect and placing him in the back of the patrol car did not exceed the reasonable bounds of an investigative detention). Further, "the use of guns in connection with a stop is permissible where the police reasonably believe they are necessary for their protection." *United States v. Merritt*, 695 F.2d 1263, 1273 (10th Cir. 1982).

After considering the actions taken by Maahs, his two associates and the officers, the district court concluded that "all of the activity considered as a whole justified the manner . . . of

[Maahs'] detention." We agree. As discussed above, the officers had reasonable suspicion of a drug crime or potential robbery. In other contexts, we have noted that guns often accompany drug activity. *See State v. Rojas-Tapia*, 151 Idaho 479, 483, 259 P.3d 625, 629 (Ct. App. 2011) (concluding a protective sweep was justified, in part, by testimony from narcotics officer that "persons involved in drug activity often carried guns"); *State v. Crooks*, 150 Idaho 117, 122, 244 P.3d 261, 266 (Ct. App. 2010) (recognizing "the reasonableness of the belief that drug crimes are often accompanied by weapons use" in concluding that investigative frisk was valid). Robbery also often involves weapons and is inherently dangerous. *See, e.g.*, *State v. Butcher*, 137 Idaho 125, 131, 44 P.3d 1180, 1186 (Ct. App. 2002) (holding that officer was justified, based on the "nature of the crime" of robbery, in treating van's occupants "as armed and dangerous and ordering them out of the van and handcuffing them" during an investigative detention). In addition, the district court found that the second officer "was in the vulnerable position of having to pass the closed bathroom door with another man inside" the bathroom. The potential danger to the officers' safety and the safety of others in the credit union, in conjunction with Maahs' noncompliance and evident flight risk, made it reasonable for the second officer to point his gun at Maahs, handcuff him, and place him in a police vehicle during the investigative detention. Maahs has failed to show that, under the totality of circumstances, the officers' actions exceeded the scope of a reasonable investigative detention.

Having concluded that the officers' actions in detaining Maahs were reasonable in light of the circumstances, we need not address Maahs' argument that his detention amounted to a "de facto" arrest. As previously noted, "the imposition of restraints on the individual's freedom that rise to the equivalent of arrest may be reasonable during an investigative detention where such action is justified by the surrounding circumstances, including the need to safeguard officers from injury." *Stewart*, 145 Idaho at 645, 181 P.3d at 1253. Even if Maahs' detention rose to a level similar to an arrest, the manner of his detention remained reasonable based on his noncompliance, flight risk, and potential danger to officers and others in the credit union. Consequently, Maahs has failed to show the district court erred in denying his motion to suppress.

## IV.

## CONCLUSION

Maahs has failed to show error in the district court's challenged factual findings. The district court correctly concluded that the officers had reasonable suspicion to detain Maahs and that, under the totality of circumstances, the officers did not exceed the scope of an investigative detention. Because the officers' actions were reasonable in light of the circumstances, we do not address Maahs' argument that his detention amounted to a de facto arrest. Therefore, Maahs has failed to show the district court erred in denying his motion to suppress. Consequently, Maahs' judgment of conviction for trafficking in methamphetamine is affirmed.

Judge GRATTON and Judge BRAILSFORD, **CONCUR**.